

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00436-CV

CHRISTOPHER BROWN AND
CARRIE BROWN

APPELLANTS

V.

ENTERPRISE RECOVERY
SYSTEMS, INC.

APPELLEE

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This case arises out of actions taken by Appellee Enterprise Recovery Systems, Inc. (ERS), a debt collector, to recover the student loan debt of Appellant Christopher Brown. ERS made repeated calls to a cell phone in the possession of Christopher's wife, Appellant Carrie Brown. Based on those calls, the Browns sued ERS for violations of the federal Fair Debt Collection Practices

---

[1]*See* Tex. R. App. P. 47.4.

Act (FDCPA),[2] the federal Telephone Consumer Protection Act (TCPA),[3] the Texas Fair Debt Collection Practices Act,[4] and the Texas Deceptive Trade Practices Act (DTPA).[5]  A visiting judge denied the Browns' motion for directed verdict and granted ERS's motion for directed verdict.

On appeal, the Browns argue in four issues that the visiting judge erred by failing to recuse himself after they objected to his appointment, by granting directed verdict for ERS when the presiding judge had denied ERS's previously filed summary judgment motion and in light of the evidence supporting the Browns' claims, and by denying their motion for directed verdict on their TCPA claim.  Because we hold that the Browns did not timely object to the visiting judge's assignment and that the trial court erred by granting a directed verdict on some but not all of the Browns' claims, we affirm in part and reverse in part.

## Background

The Browns sued ERS alleging that ERS had used an automatic telephone dialing system to make numerous telephone calls to the Browns' cell phone in an attempt to collect a debt.  They further alleged that in one phone call, an ERS employee threatened to place a tax lien on Christopher and that the ERS

---

[2]15 U.S.C.A. §§ 1692–1692k (West 2009 & Supp. 2013).

[3]47 U.S.C.A. § 227 (West 2001 & Supp. 2013).

[4]Tex. Fin. Code Ann. §§ 392.001–392.404 (West 2006).

[5]Tex. Bus. & Com. Code § 17.41–.63 (West 2011 & Supp. 2012).

employee who called them did not disclose ERS's identity, even when requested to do so. ERS filed a motion for summary judgment, which the trial court denied.

Two weeks before trial, on July 12, 2011, a visiting judge was assigned to hear the case. No notice of the visiting judge's appointment was sent to the parties. On July 25, 2011, the day of trial, the Browns' attorney learned of the appointment upon entering the courtroom. He did not initially object to the appointment because he was "unaware of the procedural requirements" for doing so. He contacted his office and, while waiting to hear back, participated in a hearing on some motions. After he heard back from his office, he objected both orally and in writing to the visiting judge's appointment. The visiting judge overruled the objection, and the case proceeded to trial.

At the close of evidence, the Browns filed a motion for directed verdict on their TCPA claim. ERS filed a motion for directed verdict on all of the Browns' claims. The visiting judge denied the Browns' motion, granted ERS's motion, and signed a judgment ordering that the Browns take nothing on their claims and taxing costs against the Browns.

The Browns tendered payment of the court costs to ERS's attorney and requested that ERS file a notice of satisfaction of judgment, which ERS did. The Browns subsequently filed a motion for new trial, which was denied by operation of law. The Browns then filed this appeal.

**Analysis**

*Mootness of the Appeal*

We first address ERS's contention that the Browns' appeal is moot because of the voluntary payment rule. On September 6, 2011, ERS filed a satisfaction of judgment stating that the Browns had paid the court costs assessed against them and were released from any further obligation to pay any money judgment resulting from the case. ERS asserts that the Browns paid the court costs without showing their express intent to appeal, and, thus, under the voluntary payment rule, the appeal is moot. In response, the Browns argue that "in a letter dated August 29, 2011, the Browns explicitly communicated to ERS that they were tendering payment for the exclusive purpose of halting the accrual of post-judgment interest and that they would continue to pursue appellate review."

Under Texas law, voluntary payment of a judgment moots an appeal of that judgment only if the payment is made without an expressed intent to continue the appeal.[6] In response to ERS's argument in its brief, the Browns filed a reply brief in this court. This reply brief includes an affidavit made by the Browns' attorney and a copy of a letter sent to ERS's counsel before ERS filed the satisfaction of judgment, both of which we may consider to ascertain factual

---

[6]*BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005).

4

matters necessary to the proper exercise of this court's jurisdiction.[7] The letter states that the Browns "intend to and will appeal the judgment" against them, that "[t]his letter charges you with notice that excepted from any payment tendered in satisfaction of [the judgment] is [the Browns'] right to appeal," and that "we hereby explicitly reserve [the Browns'] right to appeal."

In oral argument, ERS asserted that because the letter was sent to ERS after payment had already been tendered to ERS (but before the satisfaction of judgment was filed), the expression of intent to appeal came too late. We disagree. The basis of the voluntary payment rule is "to prevent a party who has freely decided to pay a judgment from changing his mind and seeking the court's aid in recovering the payment."[8] The rule keeps a party from paying out money and leading the other party to act as though the matter were closed, "and then be in the position to change his mind and invoke the aid of the courts to get it back."[9] ERS knew before it filed its satisfaction of judgment that the Browns intended to

---

[7]*See* Tex. Gov't Code Ann. § 22.220 (West Supp. 2012) ("Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction."); *Miga v. Jensen* (*Miga I*), 96 S.W.3d 207, 212 (Tex. 2002).

[8]*Highland Church of Christ v. Powell*, 640 S.W.2d 235, 236 (Tex. 1982) (stating that "[a] party should not be allowed to mislead his opponent into believing that the controversy is over and then contest the payment and seek recovery").

[9]*Miga v. Jensen* (*Miga II*), 299 S.W.3d 98, 103 (Tex. 2009).

appeal. [10] The facts here do not show that the Browns misled ERS into acting as though the matter were closed. The voluntary payment rule is not as harsh as ERS portrays it.[11] We hold that the Browns' tendering of payment to ERS did not moot the appeal.

*Recusal of the Visiting Judge*

In the Browns' first issue, they argue that the visiting judge erred by failing to recuse himself after the Browns objected to his assignment under government code section 74.053.[12] That section provides that when a judge is assigned to a trial court under that chapter, the judge shall not hear the case if a party timely objects to the assignment.[13] A party's timely objection to a judge's assignment is

---

[10]*See Miga I*, 96 S.W.3d at 212 ("While Miga may have believed that Jensen's payment mooted the appeal, he could not have had any reasonable doubt that Jensen believed it did not, or that Jensen intended to pursue the appeal if legally allowed to do so.").

[11]*See Miga II*, 299 S.W.3d at 103–04 (noting that the voluntary payment rule was at one time widely used but had diminished in scope and that it had only been applied by that court twice in the previous forty years); *Burns v. Seascape Owners Ass'n, Inc.*, No. 01-11-00752-CV, 2012 WL 3776513, at *11 (Tex. App.— Houston [1st Dist.] Aug. 30, 2012, no pet.) (mem. op.) (observing that payment of a judgment made involuntarily under duress will not moot an appeal of the judgment).

[12]Tex. Gov't Code Ann. § 74.053(a), (b) (West 2013).

[13]*Id.*

6

mandatory, and an untimely objection constitutes a waiver of the objection.[14]

Notice of assignment is not mandatory under the government code.[15]

The government code at one time provided that for an objection to an assigned judge to be timely, it had to be made before the first hearing or trial, including pretrial hearings, over which the assigned judge was to preside.[16] Thus, a party could object to the visiting judge's appointment on the date of trial, so long as the objection was made before the visiting judge presided over any part of the trial.[17]

The statute has since been amended, and it now provides that the objection must be made by the earlier of (1) the seventh day after the date on

---

[14] *Sweetwater Austin Props., L.L.C. v. SOS Alliance, Inc.*, 299 S.W.3d 879, 890 (Tex. App.—Austin 2009, pet. denied); *Turk v. First Nat'l Bank of W. Univ. Place*, 802 S.W.2d 264, 265 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *see also Horn v. Gibson*, 352 S.W.3d 511, 514 (Tex. App.—Fort Worth 2011, pet. denied) (disqualification of a judge on grounds other than express constitutional grounds may be waived).

[15] Tex. Gov't Code Ann. § 74.053(a)(2) (providing that the presiding judge shall give notice of the assignment *if* it is reasonable and practicable and *if* time permits); *In re Canales*, 52 S.W.3d 698, 702 (Tex. 2001) (orig. proceeding) (noting that the statute requires notice of assignment "if practicable").

[16] *In re Hourani*, 20 S.W.3d 819, 822 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding) (setting out the prior version of the statute).

[17] *In re Canales*, 52 S.W.3d at 702; *U. Lawrence Bozé & Assocs., P.C. v. Harris Cnty. Appraisal Dist.*, 368 S.W.3d 17, 31 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Although Bozé asserts that he did not receive notice of the assignment of a visiting judge until the day of the hearing . . . , it is undisputed that he did not object to the assignment at any time before, during, or after the hearing.").

7

which the party receives actual notice of the assignment or (2) before the *date of the first hearing.*[18]  The statute authorizes the presiding judge to extend the time to file an objection upon a party's written motion that demonstrates good cause.[19]  The Browns argue that they objected at the first opportunity to do so, and their inability to file their objection any sooner was the result of the trial court's failure to provide notice of the assignment.  That is, they did not have actual notice until they arrived at the court on the date of trial, and they could not object before the date of trial as required by the statute because they did not know of the assignment until that time.  They further argue that their written motion objecting to the visiting judge's assignment demonstrated good cause.

Nothing in the language of the statute's amendment persuades us that the legislature intended to change the law to allow an objection to a judge's assignment after the assigned judge has presided over proceedings in the case.[20]  Thus, even if the Browns' written motion demonstrated good cause for not objecting before the date of trial, they waived their objection by not raising it before the assigned judge presided over pretrial matters.

---

[18]Tex. Gov't Code Ann. § 74.053(c).

[19]*Id.*

[20]*See, e.g.*, *In re H.L.F.*, No. 12-11-00243-CV, 2012 WL 5993726, at *3 (Tex. App.—Tyler Nov. 30, 2012, pet. denied) (mem. op.) (applying the same rule in a case to which the amended statute applied); *Bozé*, 368 S.W.3d at 31 (same).

8

We sympathize with the difficult position in which the Browns found themselves if, as they assert, they did not learn of the assignment until the date of trial. But the rule does not provide an exception for an attorney ignorant of the rules of waiver, and the Browns' failure to object before any pretrial proceedings constituted a waiver of their objection.

The Browns counter that the visiting judge did not make any rulings on the merits of the case prior to their objection. But waiver of an objection to a visiting judge does not depend on whether the judge's rulings went to the merits of the case. Waiver occurs when no objection is made before the assigned judge has presided over any part of the case.[21] The assigned judge ruled on objections to trial witness subpoenas, a motion for continuance, and both parties' motions in limine, all before the Browns filed their written motion. The Browns' attorney did orally object at some point during pretrial proceedings, and a conference was held off the record, but it was on the day of trial. At that point, the Browns had to file a motion in writing, and they did not do so until after the assigned judge had ruled on pretrial matters. We overrule the Browns' first issue.

*Law of the Case Doctrine*

In the Browns' second issue, they argue that the visiting judge erred by granting ERS's motion for a directed verdict on all claims in light of the presiding

---

[21] *See In re Canales*, 52 S.W.3d at 704 (disapproving of a court of appeals case to the extent it could be read to suggest that a party may timely object to a visiting judge under section 74.053 after the judge has already presided over a hearing in the case).

9

judge's earlier ruling denying ERS's motion for summary judgment. They contend that the law of the case doctrine provides that the same issue, presented a second time in the same case, should lead to the same result—a denial of ERS's motion for summary judgment. The Browns are mistaken. Even if the law of the case doctrine applied to trial court rulings,[22] a denial of a motion for summary judgment is an interlocutory order that may be changed or modified.[23] Furthermore, the evidence presented at trial was not identical to the evidence submitted in the summary judgment proceedings. Accordingly, the trial court was required to independently evaluate the evidence presented at trial in reaching its decision rather than the evidence presented in summary judgment.[24] We overrule the Browns' second issue.

---

[22] *See Cockrell v. Republic Mortg. Ins. Co.*, 817 S.W.2d 106, 115–16 (Tex. App.—Dallas 1991, no writ) (declining to apply the law of the case doctrine when there had been no prior appellate rulings in the case).

[23] *See, e.g.*, *R.I.O. Sys., Inc. v. Union Carbide Corp.*, 780 S.W.2d 489, 492 (Tex. App.—Corpus Christi 1989, writ denied).

[24] *See, e.g.*, *Milliken v. Skepnek*, No. 01-01-00372-CV, 2003 WL 361052, at *8 (Tex. App.—Houston [1st Dist.] Feb. 20, 2003, pet. denied) (mem. op.) (holding that the law of the case doctrine did not prevent the trial court from granting directed verdict when the evidence and legal theories advanced by the parties at trial were substantially different from that presented at the time of consideration of the appellees' motion for summary judgment); *Benser v. Citibank (S.D.), N.A.*, No. 08-99-00242-CV, 2000 WL 1231386, at *4 (Tex. App.—El Paso Aug. 31, 2000, no pet.) (mem. op., not designated for publication).

*Directed Verdict*

The Browns argue in their third issue that the trial court erred by granting ERS's motion for a directed verdict on all of their claims in light of the evidence presented at trial in support of the Browns' claims. In the Browns' fourth issue, they argue that the trial court erred by denying their motion for directed verdict on their TCPA claim in light of the evidence presented at trial in support of that claim. We consider these issues together.

A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent.[25] In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence.[26] We review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.[27]

---

[25] *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied).

[26] *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

[27] *Id.* at 827; *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

*TCPA Claim*

We first consider the part of the Browns' third issue challenging whether ERS established its right to a directed verdict on the Brown's TCPA claim. ERS asserted numerous grounds for directed verdict, which we will address in turn.

The TCPA makes it unlawful for a person to make a call using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service or any service for which the called party is charged for the call.[28] The TCPA provides an exception for calls made for emergency purposes and for calls made "with the prior express consent of the called party."[29] The evidence was undisputed that ERS called a cell phone registered in Christopher's name, but the parties disputed whether the TCPA applied to the calls ERS made and whether, if the TCPA did apply, ERS's calls were a violation of that law.

As a ground for directed verdict, ERS argued that the TCPA does not apply to debt collection calls. The statute does not on its face contain that limit. The Federal Communications Commission—the federal agency tasked by the TCPA with developing regulations to implement that act's requirements[30]—has

---

[28]47 U.S.C.A. § 227(b)(1).

[29]*Id.*

[30]*Id.* § 227(b)(2).

12

expressly declined to categorically exempt debt collection calls.[31]  And we observe that the case in which the United States Supreme Court held that federal and state courts have concurrent jurisdiction over private actions under the TCPA was a suit brought against a debt-collection agency.[32]  We cannot agree that the TCPA does not apply to debt collection calls, and, accordingly, ERS was not entitled to a directed verdict on this ground.

As a second ground for directed verdict, ERS asserted that the Browns had failed to plead a cause of action because they did not plead the enabling statute that made the TCPA enforceable in Texas.  ERS asserted in the trial court and on appeal that the Texas Supreme Court has stated that "the TCPA alone does not create an immediately enforceable right."[33]  ERS uses this language from *Chair King* to assert that a plaintiff bringing a TCPA claim must specifically plead the Texas enabling statute.

*Chair King* does not support ERS's proposition.  In *Chair King*, the Texas Supreme Court considered whether the passage of the TCPA by the United States Congress was in and of itself enough to make the TCPA enforceable in all

---

[31] *See* In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (2008 Rules), 23 FCC Rcd. 559, 564–65 (2008).

[32] *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

[33] *See The Chair King, Inc. v. GTE Mobilnet of Houst. Inc.*, 184 S.W.3d 707, 716 (Tex. 2006).

states.[34] The court considered whether the TCPA was an "opt-in" or an "opt-out" statutory scheme—that is, whether a TCPA claim could be brought in state court only if a state "opted in" by passing an enabling statute making it applicable in that state, or whether it applied to a state automatically unless that state expressly "opted out" of having it apply in that state.[35] It was in that context that the court used the language quoted by ERS. The court concluded that the TCPA is an "opt-in" scheme and that by adopting section 35.47(f) of the business and commerce code (now section 305.053),[36] Texas had opted in.[37] No language in that opinion suggests that a plaintiff must plead both the TCPA and Texas's enabling statute in order to plead a claim under the TCPA.[38] The Browns were not required to expressly point out section 305.053 in their pleadings in order to plead a TCPA claim. Under the "fair notice" standard for pleading, ERS could

---

[34] *Id.* at 714.

[35] *Id.* at 714–18.

[36] *See* Act of May 26, 1999, 76th Leg., R.S., ch. 635, § 2, 1999 Tex. Gen. Laws 3203, 3203, *repealed by* Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.47(1), 2007 Tex. Gen. Laws 1905, 2082.

[37] *Chair King*, 184 S.W.3d at 716; *see also MLC Mortg. Corp. v. Sun Am. Mortg. Co.*, 2009 OK 37, 212 P.3d 1199, 1205 (observing that of the states that have considered the issue, Texas is the only state to have adopted the "opt-in" theory).

[38] *See Chair King*, 184 S.W.3d at 708 (acknowledging that the legislature amended the business and commerce code to allow parties to bring suit in state court for TCPA violations); *see also Mims*, 132 S. Ct. at 751 ("TCPA liability thus depends on violation of a federal statutory requirement or an FCC regulation . . . , not on a violation of any state substantive law.").

14

ascertain from the Browns' pleading what claim they were asserting.[39]  ERS was therefore not entitled to a directed verdict on this ground.

ERS asserted as another ground that even if the federal statute applies to debt collection calls, the Texas version does not apply to such calls.  The Texas statute does not on its face exclude debt collectors.[40]  Furthermore, we agree with the conclusion of the Dallas Court of Appeals in *First National Collection Bureau, Inc. v. Walker*[41] that while Texas may adopt more restrictive requirements than the TCPA, it may not adopt less restrictive requirements for claims under the TCPA.  Because the federal statute applies to debt collecting,[42] we disagree with ERS's argument that Texas does not protect Texas residents from debt collectors who violate the TCPA.  Directed verdict was not proper on this ground.

As a fourth ground for directed verdict, ERS argued that section 302.055 of the business and commerce code[43] exempts educational institutions and that

---

[39]*See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000) (describing the "fair notice" standard for pleading that "looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant").

[40]*See* Tex. Bus. & Com. Code Ann. § 305.053 (West Supp. 2012).

[41]348 S.W.3d 329, 340 (Tex. App.—Dallas 2011, pet. denied).

[42]*See* 2008 Rules at 565 ("We note that this prohibition applies regardless of the content of the call, and is not limited only to calls that constitute 'telephone solicitations.'").

[43]Tex. Bus. & Com. Code Ann. § 302.055 (West 2009).

15

ERS was acting as an agent of the federal programs for student educations loans. Section 302.055 exempts educational institutions from the application of chapter 302.[44] But the Browns did not bring a claim under chapter 302, so section 302.055 does not apply to their claims, and ERS's argument is irrelevant. A directed verdict could not have been properly granted to ERS on this ground.

Another ground asserted by ERS was that Carrie lacked standing because its calls were intended for her husband and were made to his cell phone. We disagree. The TCPA provides two types of private actions for a violation of § 227(b) or of the regulations prescribed under that subsection: (1) a suit to enjoin the violation and (2) an action to recover damages of either the actual monetary loss from the violation or $500 in damages for each violation, whichever is greater.[45] A party may seek both the injunctive relief and damages. The TCPA does not expressly provide that only the intended recipient may bring an action for violation of its provisions; it states only that "a person" may bring an action for the violation.[46]

It is a violation of the TCPA for a person to make a call using any automatic telephone dialing system to a cell phone or to any service for which the called party is charged unless the person has consent to do so. We agree with

---

[44] *Id.*

[45] 47 U.S.C.A. § 227(b)(3).

[46] *See id.*

16

other courts that have determined that a person has standing even if the person is not the "intended recipient" of the call and even if the person is not the person who pays for the cell phone service.[47]  Carrie is the primary user of the cell

[47]*Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D. Wash. 2012) (holding that the plaintiff had standing to assert a violation of the TCPA for text messages sent to her cell phone even though her ex-husband was the primary account holder and paid the bill for the service and noting that it was her privacy interest that the TCPA was intended to protect); *Page v. Regions Bank*, 917 F. Supp. 2d 1214, 1218–19 (N.D. Ala. 2012) (discussing other cases that have considered who has standing under the TCPA, distinguishing cases holding that someone other than the "intended recipient" had standing, and holding that the plaintiff had standing because even though the telephone was registered in his fiancé's name, the plaintiff was "the regular user and carrier of the cellular telephone, as well as the person who needs the telephone line to receive other calls"); *Kane v. Nat'l Action Fin. Servs., Inc.*, No. 11-CV-11505, 2011 WL 6018403, at *1, *6–7 (E.D. Mich. Nov. 7, 2011) (holding that the plaintiff had alleged an injury when he alleged that he had received several hundred phone calls—calls for which he was not the intended recipient—and that the statute grants standing to any person or entity to bring a claim); *D.G. ex rel. Tang v. William W. Siegel & Assocs., Attorneys at Law, LLC*, 791 F. Supp. 2d 622, 625 (N.D. Ill. 2011) (holding that the TCPA grants a cause of action to any person for violation of the TCPA but that, "[e]ven if the TCPA only affords a right of relief to the 'called party,' . . . Plaintiff was the called party because Siegel intended to call Plaintiff's cellular telephone number and Plaintiff is the regular user and carrier of the phone"); *see also Nelson v. Santander Consumer USA, Inc.*, No. 11-CV-307-BBC, 2013 WL 1141009, at *6 (W.D. Wis. Mar. 8, 2013) (stating that the TCPA prohibits the use of automatic dialing to any telephone number assigned to a cell phone regardless of who answers or receives the call and that the TCPA does not limit the private right of action to those brought by subscribers or "called parties"); *Swope v. Credit Mgmt., LP*, No. 4:12CV832 CDP, 2013 WL 607830, at *2–3 (E.D. Mo. Feb. 19, 2013) (stating that the TCPA's plain language grants standing to "any person," not just the called party; that the only reference to a "called party" in that section of the TCPA "appears in one of the affirmative defenses to enforcement of the statute: a call made with the prior express consent of the called party"; and that even if the TCPA does limit standing to "called parties," a person is a "called party" "if the defendant intended to call the individual's number, and that individual was the regular user and carrier of the phone"); *D.G. v. Diversified Adjustment Serv., Inc.*, No. 11 C 2062, 2011 WL 5506078, at *2–3 (N.D. Ill. Oct. 18, 2011) (noting that nothing in the TCPA limits

17

phone, and it is Carrie's privacy interest that the TCPA is designed to protect. If ERS did not have Carrie's consent and its calls to her were otherwise in violation of the TCPA, then Carrie has standing to enjoin that violation, to recover damages, or both. To hold otherwise would contravene the plain language of the statute and would allow a person to call the cell phone belonging to someone other than the intended recipient while leaving the phone user with no statutory basis to stop the calls.

ERS also argued that it could only be liable for calls actually received, that is, those calls that were answered. The TCPA does not contain such a limitation.[48] ERS bases its argument on language in Texas's enabling statute, which states that "[a] person who *receives* a communication that violates 47 U.S.C. Section 227 . . . may bring an action in this state."[49]

The Dallas Court of Appeals addressed this argument in *First National Collection Bureau*.[50] We agree with that court's analysis of the issue and its holding that, "assuming without deciding Texas law was intended to create a right of action only for calls 'received,' such law is preempted by the TCPA" and that

---

the private right of action to the "called party" and that, even if it did contain that limitation, "the language and structure of the TCPA indicate that the term 'called party' refers to the actual recipient and not the intended recipient of a call").

[48]*See* 47 U.S.C.A. § 227(b)(3).

[49]Tex. Bus. & Com. Code Ann. § 305.053 (emphasis added).

[50]348 S.W.3d at 341.

Texas Supreme Court precedent does not preclude this holding.[51]  A directed verdict for ERS was not proper on this ground.

ERS further asserted as a ground for directed verdict that the Browns did not prove that they were charged for receiving calls.  The TCPA states that it prohibits calls to any telephone number assigned to a cellular telephone service *or* to any service for which the called party is charged for the call.  On its face, the TCPA does not appear to apply only to telephone calls made to a service for which the called party is charged.[52]

But assuming that the TCPA only prohibits calls when the called party is charged for the call, Carrie testified that Christopher had a cell phone plan in his name and that the cell phone called by ERS was on that plan.  Testimony that the Browns had a phone plan through a third-party provider for cellular phone services is sufficient to show that they were charged for the calls.[53]

---

[51]*Id.* at 341–42.

[52]*See* In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (2003 Rules), 18 FCC Rcd. 14014, 14115 (2003) ("We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number."); *see also Martin v. Leading Edge Recovery Solutions, LLC*, No. 11 C 5886, 2012 WL 3292838, at *4 (N.D. Ill. Aug. 10, 2012) (noting that the statute, read as a whole, supports the conclusion that the phrase "for which the called party is charged for the call" only modifies the phrase "any service," and "therefore the TCPA is violated even if the called party does not incur a charge that is specifically linked to the automated call").

[53]2003 Rules, 18 FCC Rcd. at 14115 ("The Commission has long recognized, and the record in this proceeding supports the same conclusion, that

19

Another ground asserted by ERS was that its calls did not violate the automatic telephone dialing system provision because the telephone dialing system that ERS uses does not randomly generate telephone numbers. The statute defines an "automatic telephone dialing system" as equipment with the capacity (1) "to store or produce telephone numbers to be called, using a random or sequential number generator" and (2) "to dial such numbers."[54] Under the statute, it does not matter whether the caller actually uses the system to randomly or sequentially generate numbers to call and then calls those generated numbers; all that matters is that the equipment has the capacity to generate and dial numbers.[55] Regarding its system's capacity, ERS argued that there was no testimony that the system had the capacity to randomly generate calls.

ERS argued vigorously to keep the operating manual for the system from being admitted into evidence by the Browns, and the trial court sustained its

wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.").

[54]47 U.S.C.A. § 227(a)(1).

[55]*See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (stating that "the statute's clear language mandates that the focus must be on whether the equipment has the capacity 'to store or produce telephone numbers to be called, using a random or sequential number generator'" and that "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it").

objection. But ERS representative Michael Kaufman[56] did testify about the system. He testified that ERS uses a phone system that "houses borrower accounts" to dial the numbers that its employees call. ERS "develop[s] a report to select borrowers that [ERS] would like [its] dialing system to call," resulting in what it refers to as a "campaign pool." The system dials a number from that pool. If a person answers the call but no ERS representative is available to take the call, then the system will either put the recipient on hold or will terminate the call. If no person answers the call, the system reschedules the number to be dialed later. If a person answers the call but hangs up, then the number is generally rescheduled to be dialed again later. If all of the calls in that day's pool are not dialed that day, then "the pool is still there and can be used."

The FCC has addressed the use of systems such as the one that ERS uses, referred to as "predictive dialers."[57] The FCC has explained that "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls."[58] The hardware has the capacity to dial those numbers from a database of numbers.[59] The FCC stated that usually the

---

[56]In the appellate record, the representative's name is spelled alternately Kaufman, Kauffman, and Kaufmann.

[57]2003 Rules, 18 FCC Rcd. at 14022, 14091 (describing predictive dialers).

[58]*Id.* at 14091.

[59]*Id.*

company using the system programs the numbers to be called into the equipment, "and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call."[60] The FCC noted that "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation."[61]

The FCC has expressly affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[62] The evidence at trial showed that ERS uses a system that meets the FCC's description of a predictive dialer. Accordingly, it is irrelevant that ERS does not use the system to randomly generate telephone numbers. ERS's system is regulated by the TCPA because it meets the definition for automatic telephone dialing system. Accordingly, directed verdict could not have properly been granted on this ground. We therefore do not address the Browns's argument that the trial court should have admitted the operating manual for ERS's telephone system.

Next, ERS argued that the Browns consented to the calls. It contended that Christopher gave his cell phone number to Sallie Mae when he signed his promissory note, and consent to call a cell phone provided to a creditor is also

---

[60]*Id.*

[61]*Id.*

[62]2008 Rules, 23 FCC Rcd.at 566; 2003 Rules, 18 FCC Rcd. at 14093.

22

consent to the creditor's agent. But the record does not support ERS's argument.

The FCC has said that in some circumstances, a creditor is deemed to have consent to call a debtor's cell phone for debt collection purposes.[63] But the FCC further emphasized that this prior consent "is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."[64] The FCC has also said that the debt collector has the burden of showing that the debtor provided prior express consent.[65] Thus, the FCC considers the question of consent to be an affirmative defense rather an element of a plaintiff's claim.[66] Under FCC regulations, ERS had the burden to show (1) that Christopher provided the number to ERS or Sallie Mae and (2) that he did so during the transaction that resulted in the debt owed.

---

[63]2008 Rules, 23 FCC Rcd.at 564.

[64]*Id.* at 564–65.

[65]*Id.* at 565.

[66]*See Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011) (unpublished op.); *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 730 (S.D. Tex. 2012) (noting that "the longstanding administrative guidance that has been provided on this issue" views consent as an affirmative defense). *But see Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (declining to consider whether consent is an element of the cause of action or an affirmative defense).

In its motion for directed verdict, ERS pointed to evidence of Christopher's testimony confirming that when he filled out paperwork for rehabilitation of his loans, he provided a phone number. ERS also pointed out that the Browns did not have a residential line or landline at which ERS could contact him. ERS argued that the evidence was enough for consent to be deemed. ERS relied on *Cunningham v. Credit Management, L.P.*, in which the trial court found that the evidence made a prima facie showing of consent when the plaintiff refused to disclaim that he had provided the number to his creditor.[67] In its brief in this appeal, ERS also points to testimony from ERS's representative that Sallie Mae provided ERS with the phone number and that a borrower is required to provide a telephone number when signing a student loan promissory note.

But no testimony showed from what source Sallie Mae obtained the cell phone number that it gave to ERS. Kaufman stated that ERS uses the number provided to it by the client and that "we believe that that's the number that was provided to them by the borrower," but he also stated that "I don't believe that my client screens out what type of number this is." Kaufman's belief that the number provided by ERS's client was provided to that client by the borrower is not supported by any evidence in the record, and Kaufman did not provide any basis for that belief. Neither Christopher nor Carrie testified that they ever provided

---

[67]*Cunningham v. Credit Mgmt., L.P.*, No. 3:09-CV-1497-G(BF), 2010 WL 3791104, at *5 (N.D. Tex. Aug. 30, 2010), *report and recommendation adopted*, No. 3:09-CV-1497-G(BF), 2010 WL 3791049 (N.D. Tex. Sept. 27, 2010).

this cell phone number to Sallie Mae or any lender, either in connection with the original promissory note or in the paperwork for rehabilitation of the loan. Copies of the original promissory note were not produced by either side. No party produced copies of any applications that Christopher completed for rehabilitation of his loan to take it out of default. Thus, the evidence is not enough for consent to be deemed.

Even if we agreed with the reasoning in *Cunningham*, that case is distinguishable in that Christopher did not evade answering whether he had provided the cell phone number to ERS or its principal. To the contrary, the only direct evidence regarding deemed consent was Christopher's testimony, and he stated that neither he nor his wife gave ERS permission to call that number and that he did not provide that number to Sallie Mae or anyone else with his loan application. The evidence relied on by ERS is not sufficient for consent to be deemed. ERS produced no other evidence of consent. ERS therefore could not have obtained a directed verdict on the ground of consent.

Our holding does not change even if we depart from the FCC's position on showing consent and put the burden on the Browns as plaintiffs to show a lack of consent.[68] Both Carrie and Christopher testified that they did not give ERS permission to call the cell phone. Christopher testified that he did not provide the number to Sallie Mae or anyone else when he filled out his loan application. This

_____

[68] *See Gene & Gene LLC*, 541 F.3d at 327–28.

25

evidence was sufficient to defeat ERS's right to a directed verdict on the ground of consent.

Having reviewed all of the grounds urged by ERS for a directed verdict on the Browns' claim for TCPA violations, we hold that the directed verdict cannot be upheld on any of the grounds urged by ERS. We sustain this part of the Browns' third issue.

Lastly with respect to the TCPA claim, we consider the Browns' fourth issue and whether they established their right to a directed verdict on their TCPA claim and their right to treble damages. The evidence at trial was sufficient to establish as a matter of law that ERS called a cell phone registered to Christopher and used by Carrie, that it used a predictive dialer, and that it did not have consent to call the cell phone. The Browns therefore established as a matter of law that ERS violated the TCPA, and they were entitled to a directed verdict on their claim. We sustain this part of the Browns' fourth issue, and we reverse this part of the trial court's judgment. We remand this claim to the trial court for it to determine the question of damages.[69]

Regarding the claim for treble damages, the TCPA provides that for a willful or knowing violation of the TCPA, the trial court may in its discretion increase the award "to an amount equal to not more than 3 times" the damages

---

[69]*See* 47 U.S.C.A. § 227(b)(3) (providing that a person bringing a claim for violations of the TCPA may recover for actual monetary loss or $500 for each violation, whichever is greater).

26

award.[70]  The TCPA does not define "willful" or "knowing."  A different part of the federal Communications Act of 1934, of which the TCPA is a part,[71] defines the term "willful" to mean "the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this chapter."[72]  But that chapter on its face applies to radio communications, not telephone communications.

Some courts have held that in order to show a willful or knowing violation of the TCPA, the plaintiff need only show that the defendant willfully or knowingly committed the act that violated the TCPA, while others have held that the plaintiff must show that the defendant had reason to know or should have known that the conduct would violate the TCPA.[73]  This court follows the latter rule.[74]  It is undisputed that ERS made calls to the cell phone in question.  But to recover

---

[70]*Id.*

[71]*See Chair King*, 184 S.W.3d at 709 (noting that the TCPA amended the Communications Act of 1934).

[72]47 U.S.C.A. § 312 (West 2001 & Supp. 2013).

[73]*See Stewart v. Regent Asset Mgmt. Solutions*, No. 1:10-CV-2552-CC-JFK, 2011 WL 1766018, at *6–7 (N.D. Ga. May 4, 2011) (discussing the split of authority).

[74]*See Mfrs. Auto Leasing, Inc. v. Autoflex Leasing, Inc.*, 139 S.W.3d 342, 346 (Tex. App.—Fort Worth 2004, pet. denied) (applying the TCPA subsection regulating faxes and stating that "the TCPA is willfully or knowingly violated when the defendant knows of the TCPA's prohibitions, knows he does not have permission to send a fax ad to the plaintiff, and sends it anyway").

treble damages, the Browns had to show that ERS knew of the TCPA's requirements and that it knew or should have known that its actions violated the Act. Although ERS records introduced at trial suggested that ERS was aware of requirements of the FDCPA, no evidence at trial established as a matter of law that ERS was aware of the TCPA or its requirements. The Browns therefore did not establish as a matter of law that they were entitled to treble damages under the TCPA, and they failed to raise a fact issue to defeat ERS's motion for directed verdict as to whether they were entitled to treble damages. We overrule this part of the Browns' third and fourth issues.

*DTPA Claim*

Regarding the Browns' DTPA claim, ERS asserted in its directed verdict motion that the Browns had failed to produce evidence of damages. The Browns contend that the finance code provides that a violation of the Texas Fair Debt Collection Practices Act is a violation of the DTPA. The Browns are correct.[75] But the DTPA requires evidence of damages before a plaintiff may recover. Section 17.50(a) of the DTPA provides that a consumer may maintain an action when certain acts of the defendants "constitute a producing cause of economic damages or damages for mental anguish."[76] Subsection (h) provides that "if a

---

[75]*See* Tex. Fin. Code Ann. § 392.404.

[76]Tex. Bus. & Com. Code Ann. § 17.50(a); *see also Latham v. Castillo*, 972 S.W.2d 66, 69 (Tex. 1998) (noting that the prior version of the DTPA provided that a consumer could maintain an action where the defendant's acts constituted a producing cause of actual damages and stating that mental anguish damages

claimant is granted the right to bring a cause of action under this subchapter by another law, the claimant is not limited to recovery of economic damages only, but may recover any actual damages incurred by the claimant."[77] Thus, for the Browns' DTPA claim based on a violation of the Texas Fair Debt Collection Practices Act, which would qualify as "another law" under subsection (h), they were required to provide evidence of damages to prevail on their claims.[78]

The Browns produced no evidence of economic damages. The Browns' claim therefore could have only survived the directed verdict if they provided legally sufficient evidence of some other form of actual damages,[79] which includes mental anguish damages.

Evidence of mental anguish damages is legally sufficient "when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs'

---

are actual damages); *Anderson v. Long*, 118 S.W.3d 806, 811 (Tex. App.—Fort Worth 2003, no pet.) (holding that the trial court properly granted no-evidence summary judgment on Anderson's DTPA claim because she presented no evidence that she suffered any damages from Long's acts).

[77]Tex. Bus. & Com. Code Ann. § 17.50(h); *see Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (stating that "[a]ctual damages are those damages recoverable under common law").

[78]*See* Tex. Bus. & Com. Code Ann. § 17.50(a), (h).

[79]*See, e.g., Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) (characterizing damages for loss of character and reputation as actual damages).

daily routine."[80]  If no such direct evidence is introduced, we look at "whether the record reveals any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger,'" applying traditional no-evidence standards.[81]

Having reviewed the record, we have not found any testimony from Carrie about the nature, duration, or severity of any mental anguish she may have suffered as a result of telephone calls from ERS employees.  The Browns did not provide any other evidence that the telephone calls caused Carrie to suffer a high degree of mental pain and distress to a degree that made it more than mere worry, anxiety, vexation, embarrassment, or anger.  Christopher testified that the calls made Carrie "really upset" and that the calls affected their relationship in that they stopped playing games with their children every night and that Carrie did not want to have sex with him as often.  He also stated that "everyday activities that we would spend doing together became limited" because "she was beat from . . . dealing with the phone calls."  Carrie agreed with ERS's attorney that Christopher's job loss right before their marriage made things "a little stressful" at their house.  The Browns did not provide any other evidence of Carrie's mental state, and this evidence does not show the high degree of mental pain and distress that would constitute mental anguish.  Accordingly, the Browns

---

[80]*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

[81]*Id.*

30

did not provide sufficient evidence of Carrie's mental anguish. The Browns produced no evidence of any other form of actual damages suffered by Carrie, and therefore the trial court did not err by granting directed verdict for ERS on her DTPA claim.[82]

As to Christopher, ERS asserted in its motion for directed verdict that Christopher's only testimony of damages related to loss of consortium. ERS argued that because loss of consortium damages cannot be recovered absent proof of physical injury to the spouse and that because the Browns put on no evidence of physical injury to Carrie, it was also entitled to a directed verdict on Christopher's claim.

ERS is correct that Christopher did not testify about the nature, duration, or severity of any mental anguish he experienced and that nothing in his testimony would support a finding that he experienced a high degree of mental pain and distress. He stated that the situation was stressful, that the repeated telephone calls made him feel "annoyed that it was so excessive," and that he felt "like less of a man" because he had put Carrie in the situation by not being able to pay back his loans. This testimony does not support a finding of mental anguish. The Browns put on no other evidence of actual damages suffered by Christopher. Assuming that for purposes of the DTPA, loss of consortium

---

[82]*Cf. Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680–81 (Tex. 1986) (holding that there was a fact question on the extent of the plaintiffs' mental anguish injuries resulting from debt collection practices).

31

damages constitute actual damages,[83] ERS is correct that Christopher could not recover for loss of consortium absent proof of physical injury to Carrie.[84] The Browns did not put on any evidence that Carrie suffered physical injuries because of ERS's phone calls. Because the Browns did not produce any evidence that they suffered actual damages as a result of ERS's actions, the trial court did not err by granting directed verdict for ERS on that claim. We therefore do not examine ERS's other asserted grounds for directed verdict as to the Browns' DTPA claim. We overrule this part of the Browns' third issue.

*FDCPA Claims*

We now consider the Browns' claim that ERS violated the FDCPA, which prohibits abusive debt collection practices by debt collectors.[85] In its directed verdict motion, ERS asserted that Christopher's FDCPA claim was barred by that act's one-year statute of limitations.[86] The calls on which the Browns base their claims ended on November 4, 2009. Christopher was not added as a plaintiff to

---

[83]*See Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex. 1980) (noting under prior version of DTPA that "[a]ctual damages means those recoverable at common law"); *Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex. 1978) (stating that recovery for loss of consortium is recognized under the common law).

[84]*Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex. 1994).

[85]*See* 15 U.S.C.A. §§ 1692–1692k.

[86]*See id.* § 1692k(d) (stating that a civil action for a violation of the FDCPA could be brought in any appropriate United States district court within one year from the date on which the violation occurs).

32

the suit until at least November 8, 2010.[87]  As ERS points out, this date is more than one year from the date of the last call.

On appeal, the Browns contend that the statute of limitations does not bar Christopher's claim because the second amended petition relates back to the date of the original petition under section 16.068 of the civil practice and remedies code.[88]  But that statute addresses adding claims, not parties.  With limited exceptions not applicable here, an amended pleading adding a new party does not relate back to the original pleading.[89]  The Browns cite to *Foust*[90] for the proposition that because ERS was not surprised, prejudiced, or disadvantaged by the addition of Christopher as a plaintiff, the relation-back doctrine applies. But that case involved misnomer, an exception to the rule that a pleading adding a new party does not relate back.[91]  *Foust* is therefore inapplicable.  Because

---

[87]At ERS's request, the trial court took judicial notice that the Browns' second amended petition, which added Christopher as a plaintiff, was filed on November 8, 2010.  The copy of the second amended petition that appears in the clerk's record, however, has a file stamp date of November 22, 2010.

[88]Tex. Civ. Prac. & Rem. Code Ann. § 16.068 (West 2008); *see Univ. of Tex. Health Sci. Ctr. at San Antonio v. Bailey*, 332 S.W.3d 395, 400 (Tex. 2011) ("The relation-back doctrine does not affect the running of limitations on a cause of action; rather, it defines what is to be included in 'the action' to which limitations applies.").

[89]*Bailey*, 332 S.W.3d at 400.

[90]*Foust v. Estate of Walters ex rel. Walters*, 21 S.W.3d 495, 501 (Tex. App.—San Antonio 2000, pet. denied).

[91]*Id.*; *see Bailey*, 332 S.W.3d at 400 (listing misnomer and misidentification as exceptions to this rule).

33

Christopher was not added as a plaintiff until more than one year after the last telephone call, his FDCPA claim is time-barred.[92]

With respect to Carrie's claims under the FDCPA, she asserted that ERS breached three provisions of that act: § 1692d(5), § 1692(d)(6), and § 1692e(5). Section 1692d(5) prohibits a debt collector from "[c]ausing a telephone to ring . . . repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."[93] The Browns alleged that ERS called 108 times in one month, once as many times as nine times in one day. At trial, ERS representative Kaufman testified that ERS records showed that its phone system called the Browns' cell phone 108 times. Carrie testified that the calls were "constant, repetitive, all the time [her] phone ringing."

In its motion for directed verdict, ERS argued that daily calls, unaccompanied by other egregious conduct, is insufficient to raise a triable issue of fact for the jury on whether it violated § 1692d(5). It asserted that most of the 108 calls were either withdrawn (that is, rang two or three times and then hung up) or "did not leave the building" (that is, the number was selected by the phone system for dialing but was not actually dialed because all ERS representatives were busy on other calls). Kaufman did not testify, however, that "most" of the

---

[92]*See* 15 U.S.C.A. § 1692k.

[93]15 U.S.C.A. § 1692(d)(5).

calls were withdrawn or were not actually dialed. He only stated that the 108 number shown by ERS records would include hang ups and withdrawn calls.

Whether a debt collector's repeated or continuous telephone calls were made with intent to annoy, abuse, or harass is usually a question of fact.[94] But in some circumstances, courts determine that the facts alleged do not, as a matter of law, show the requisite intent.[95] In its brief, ERS cites to cases that held that a high call volume did not indicate the requisite intent.[96] But as one Texas federal district court has pointed out, "There is no bright line rule as to the specific amount or pattern of calls sufficient to raise a fact issue regarding the intent to annoy, abuse, or harass," and "courts simply disagree on the amount or pattern of calls needed to raise a triable fact issue."[97]

We hold that the evidence was sufficient to raise a fact issue on whether ERS violated this section. ERS's records showed that it selected the Browns' number to call 108 times in one month. Though it argued that not all of those

---

[94] *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985); *Stirling v. Genpact Servs., LLC*, No. 2:11-CV-06369-JHN-MANx, 2012 WL 952310, at *3–4 (C.D. Cal. Mar. 19, 2012) (noting that "[n]umerous courts throughout the nation have held that the intent to annoy, abuse, or harass may be inferred from the nature, pattern, and frequency of debt collection calls").

[95] *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330 (6th Cir. 2006).

[96] *See, e.g.*, *Tucker v. CBE Grp., Inc.*, 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010).

[97] *Young v. Asset Acceptance, LLC*, No. 3:09-CV-2477-BH, 2011 WL 1766058, at *3 (N.D. Tex. May 10, 2011).

calls were actually dialed, it produced no evidence to show how many of the 108 times the number was selected but was not actually dialed. Carrie testified that she requested the calls to stop but that ERS continued to call. We cannot say as a matter of law that ERS did not violate § 1692d(5), and therefore directed verdict on this claim was not proper. We sustain this part of the Browns' third issue.

Section 1692d(6) prohibits a debt collector from placing telephone calls "without meaningful disclosure of the caller's identity."[98] The Browns alleged that when an ERS representative called their number the first time, the employee identified ERS only as "ERS" rather than as "Enterprise Recovery Systems" and refused to state its full name or the purpose of the call. Carrie testified to that effect at trial. In ERS's directed verdict motion, it argued that the statute allows the use of acronyms, "ERS" is a registered professional name, and Carrie was able to use the Internet to determine what entity ERS referred to, and therefore ERS properly disclosed its identity.

Courts of appeals evaluating FDCPA claims use either a "least sophisticated consumer standard" or an "unsophisticated consumer standard" for communications under section 1692d.[99] Both standards serve the purpose of

---

[98]15 U.S.C.A. § 1692d(6).

[99]*Harvey*, 453 F.3d at 329–30; *see also Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1236 (5th Cir. 1997) (noting that courts have held that "in determining whether a violation of the FDCPA has occurred, the debt collector's representations, notices[,] and communications to the consumer must be viewed objectively from the standpoint of the 'least sophisticated consumer'"

protecting consumers, "including the inexperienced, the untrained[,] and the credulous."[100] Thus, the relevant question is not whether Carrie could figure out what "ERS" stood for by researching it on the Internet, but whether identifying the caller as someone from "ERS" would meaningfully disclose the identity of the caller to an unsophisticated consumer.[101]

The FDCPA authorized the Federal Trade Commission (FTC) to enforce compliance with that act's provisions.[102] ERS is correct that the FTC has said that in communicating with a debtor, a debt collector may use its full business name, the name under which it usually transacts business, or a commonly-used acronym, as long as the name is one that does not misrepresent the debt collector's identity or deceive the consumer.[103] But to comply with the plain language of the statute, any commonly-used acronym must be one that meaningfully discloses the entity's identity. Kaufman testified that ERS sometimes uses ERS to identify itself to borrowers, that it has "ERS" on its website by its full name, and that this is a registered acronym. But Kaufman did

---

and noting that the Seventh Circuit uses a similar "unsophisticated consumer" standard, which would lead to the same results in most cases).

[100] *See Taylor*, 103 F.3d at 1236.

[101] *See id.*

[102] 15 U.S.C.A. § 1692*l*(a).

[103] Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 FR 50097-02, 50107 (Dec. 13, 1988).

37

not produce any testimony about where it has registered this acronym or that it was so commonly-used that it meaningfully discloses its identify. "ERS" is not one of the commonly-used acronyms known to the general public—like "AT&T" or "IBM"—the use of which would meaningfully disclose the business's identity. That it commonly uses the name "ERS" when talking to borrowers on the telephone does not demonstrate that ERS is the name under which it usually transacts business. No evidence at trial indicated that an unsophisticated consumer would know from the use of the acronym "ERS," and nothing else, the identity of the caller. Thus, ERS did not establish as a matter of law that an unsophisticated consumer would know that "ERS" referred to Enterprise Recovery Systems, Inc. The fact that Carrie had to resort to Internet research to discover who had called her cell phone is evidence that in fact ERS did not meaningfully disclose its identity. We hold that the evidence did not establish as a matter of law that ERS meaningfully disclosed its identity and therefore directed verdict for ERS on this ground was improper. We sustain this part of the Browns' third issue.

Section 1692e(5) prohibits a debt collector from threatening to take an action that cannot legally be taken or that is not intended to be taken.[104] The Browns alleged that ERS violated this section of the FDCPA when it threatened to issue a tax lien or tax offset. The parties referred to both a "tax lien" and an

---

[104]15 U.S.C.A. § 1692e(5).

offset of the Browns' tax refund throughout the record. Taking all of the testimony and trial court filings in context, it appears that the parties used the phrase "tax lien" to indicate garnishment of a tax refund to offset the debt. The Browns do not argue differently on appeal. We therefore consider whether ERS violated § 1692e(5) by threatening a tax refund offset.

In ERS's directed verdict motion, it argued with no citation to authority that the Browns had failed to prove that it had violated this section because the debt was federal student loan debt, and therefore ERS as the agent of the creditor the United Student Aid Fund (USAF), was authorized by the Higher Education Act[105] to place a lien on Christopher's tax return in the form of an offset. For the sake of accuracy, we note that although ERS claimed its client was USAF, the appellate record indicates that its direct relationship is with Sallie Mae, who itself was hired by USAF.

The Browns do not dispute that USAF had the authority to request the IRS to offset their tax refund (and that it eventually did so). But they argue that USAF's authority is irrelevant because ERS threatened that it would take the offset itself, and ERS did not have any such authority. The testimony at trial suggests that, technically, ERS threatened to take an action that it could not itself take. Carrie's testimony was that the ERS employee told her that ERS would take a tax offset of Christopher's refund, not that ERS told her that *its client* could

---

[105]20 U.S.C.A. §§ 1001–1141 (West 2010 & Supp. 2013).

ask the IRS to offset the refund. The FDCPA has been described as a strict liability statute.[106] It is uncontroverted that ERS does not have the authority to either directly institute proceedings to take the Browns' tax refund or to request the IRS to do so.

The Second Circuit's holding in *Bentley v. Great Lakes Collection Bureau*[107] would seem to support the Browns' position. In that case, a debt collector's letter was held to be misleading because it conveyed to the consumer that the debt collector was authorized to make the decision to institute legal action.[108] In fact, the creditor retained the authority to decide whether legal proceedings would be instituted.[109]

---

[106] *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010); *Agueros v. Hudson & Keyse, LLC*, No. 04-09-00449-CV, 2010 WL 3418286, at *3 (Tex. App.—San Antonio Aug. 31, 2010, no pet.) (mem. op.) (describing the FDCPA as a strict liability statute); *see also* 15 U.S.C.A. § 1692k(c) (stating that a debt collector is not liable for a violation of the FDCPA if the "debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error"); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605, 1624 (2010) (holding that the bona fide error defense does not apply to a debt collector's incorrect interpretation of the requirements of the FDCPA).

[107] 6 F.3d 60, 63 (2d Cir. 1993).

[108] *Id.*

[109] *Id.*

But Second Circuit opinions are not binding on this court,[110] and we have found no other court's opinion that would support the Browns' position. ERS was acting, directly or indirectly, for USAF, and no party disputed that USAF could obtain an offset of the Browns' tax refund to pay on the student loan debt. Because ERS threatened to take an action that its principal legally could take, we hold that the trial court did not err by granting directed verdict for ERS on this claim. We overrule this part of the Browns' third issue.

*Texas Fair Debt Collection Practices Act Claim*

Regarding the Browns' Texas Fair Debt Collection Practices Act claim, ERS asserted in its directed verdict motion that the Browns were required to prove actual damages but failed to do so. We agree.

Under the Texas Fair Debt Collection Practices Act, a plaintiff may be awarded actual damages, injunctive relief, or both.[111] Under section 392.403(e), a plaintiff proving her entitlement to either form of relief for violations of certain specified sections of the Texas Fair Debt Collection Practices Act is entitled to damages of not less than $100 for each violation.[112] Thus, if a plaintiff establishes a right to only injunctive relief or if the plaintiff proves up actual

---

[110]*Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (stating that Texas courts may draw upon the precedents of other federals courts but are obligated to follow only higher Texas courts and the United States Supreme Court).

[111]Tex. Fin. Code Ann. § 392.403(a).

[112]*Id.* § 392.403(e).

damages that are less than $100, the plaintiff may recover at least $100.  We agree with the Dallas and Austin courts of appeals that, unlike under the FDCPA,[113] if a plaintiff does not establish either a right to injunctive relief or some actual damages, the plaintiff is not entitled to the minimum damages set out in subsection (e).[114]  Because the Browns were required to establish either a right to injunctive relief or actual damages, but they did not plead or prove their right to injunctive relief and did not prove any actual damages, the trial court did not err by granting a directed verdict for ERS on the Browns' Texas Fair Debt Collection Practices Act claim.

## Conclusion

Having overruled the Browns' first and second issues and overruled in part their third and fourth issues, we affirm the trial court's judgment as to the Browns' DTPA claim, their Texas Fair Debt Collection Practices Act claim, their claim for treble damages under the TCPA, and their claim for a violation of § 1692e(5) of

---

[113]15 U.S.C.A. § 1692k(a)(1), (a)(2)(A), (a)(3) (allowing a plaintiff under the FDCPA to recover actual damages plus attorney's fees and additional statutory damages); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 86 (2d Cir. 1998) (holding that FDCPA statutory damages could be awarded without recovering actual damages); *see also Agueros*, 2010 WL 3418286, at *6 (noting that the "vast majority of cases interpreting this provision of the FDCPA" have concluded that no award of actual damages is necessary to recover additional damages). ERS did not seek directed verdict on the issue of additional damages under the FDCPA.

[114]*Marauder Corp. v. Beall*, 301 S.W.3d 817, 823 (Tex. App.—Dallas 2009, no pet.); *Elston v. Resolution Servs., Inc.*, 950 S.W.2d 180, 184 (Tex. App.—Austin 1997, no writ).

the FDCPA.  Having sustained in part the Browns' third issue as to their claims for violations of the TCPA, § 1692d(5) of the FDCPA, and § 1692d(6) of the FDCPA, we reverse in part.  We remand this case to the trial court for further proceedings consistent with this opinion.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  August 22, 2013

43